AF Approval _____   Chief Approval _____

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                        CASE NO. 6:18-cr-182-Orl-37KRS
                                                   6:18-cr-183-Orl-37DCI
MICHAEL ANDREWS
a/k/a "Clutch"

## GLOBAL PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by

Maria Chapa Lopez, United States Attorney for the Middle District of

Florida, and the defendant, MICHAEL ANDREWS, a/k/a "Clutch," and

the attorney for the defendant, Fritz Scheller, mutually agree as follows:

A.    Particularized Terms

    1.    Counts Pleading To

        The defendant shall enter a plea of guilty to Count One of the

Indictment in 6:18-cr-182-Orl-37KRS, which charges the defendant with

conspiracy to possess with intent to distribute methamphetamine, in violation

of 21 U.S.C. §§ 846 and 841(b)(1)(A).  The defendant shall also enter a plea of

guilty to Count One of the Indictment in 6:18-cr-183-Orl-37DCI, which

Defendant's Initials _____

charges the defendant with conspiracy to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A).

2.   <u>Minimum and Maximum Penalties</u>

Count One of the Indictment in 6:18-cr-182-Orl-37KRS is punishable by a mandatory minimum term of imprisonment of 10 years up to life, a fine of not more than $10 million, a term of supervised release of at least 5 years, and a special assessment of $100 per felony count.

Count One of the Indictment in 6:18-cr-183-Orl-37DCI is punishable by a mandatory minimum term of imprisonment of 10 years up to life, a fine of not more than $10 million, a term of supervised release of at least 5 years, and a special assessment of $100 per felony count.

With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offenses, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offenses, or to the community, as set forth below.

3.   <u>Apprendi v. New Jersey</u>

In regards to both Count One of the Indictment in 6:18-cr-182-Orl-37KRS and Count One of the Indictment in 6:18-cr-183-Orl-37DCI, under <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), a maximum sentence of life imprisonment may be imposed because the following facts have been admitted

by the defendant and are established by this plea of guilty:  the quantity that

the defendant conspired to possess with intent to distribute was 50 grams or

more of methamphetamine.

    4.    <u>Elements of the Offenses</u>

        The defendant acknowledges understanding the nature and

elements of the offenses with which defendant has been charged and to which

defendant is pleading guilty.  The elements of Count One of the Indictment in

6:18-cr-182-Orl-37KRS and Count One of the Indictment in 6:18-cr-183-Orl-

37DCI are:

| | |
|---|---|
| <u>First</u>: | Two or more people in some way agreed to try to accomplish a shared and unlawful plan to distribute, or to possess with intent to distribute, methamphetamine; |
| <u>Second</u>: | The Defendant knew the unlawful purpose of the plan and willfully joined in it; and |
| <u>Third</u>: | The object of the unlawful plan was to distribute, or to possess with the intent to distribute, 50 grams or more of methamphetamine. |

    5.    <u>No Further Charges</u>

        If the Court accepts this plea agreement, the United States

Attorney's Office for the Middle District of Florida agrees not to charge

defendant with committing any other federal criminal offenses known to the

United States Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

6.    <u>Safety Valve Provision</u>

The United States will not oppose the defendant's request to the Court that it impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence, pursuant to USSG §5C1.2, if the Court finds that the defendant meets the criteria set forth in 18 U.S.C. § 3553(f).  The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

7.    <u>Concurrent Sentences</u>

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the appropriate disposition of this case is a sentence in which the sentences to be imposed on each count shall run concurrent to each other.

8.    <u>Acceptance of Responsibility - Three Levels</u>

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a).  The defendant understands that this recommendation or

Defendant's Initials _____      4

request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG §3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG §3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9.    Low End

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States does not oppose the defendant's request to the Court that the defendant receive a sentence at the low end of the applicable guideline range, as calculated by the Court. The defendant understands that this

Defendant's Initials _MOA_               5

recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

10.   Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 21 U.S.C. § 853, whether in the possession or control of the United States, the defendant or defendant's nominees.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil judicial or administrative forfeiture action.  The defendant also agrees to waive all constitutional, statutory and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

If the United States seeks the forfeiture of specific assets pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered.  In the event the forfeiture is omitted from the judgment, the

Defendant's Initials _MJH_                6

defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture and to transfer custody of such property to the United States before the defendant's sentencing.  To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control directly or indirectly, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years.  The defendant further agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct.  The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States.  The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing.  In addition to providing full and complete

information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including any agreed forfeiture amount, is collected in full.

**B.**   **Standard Terms and Conditions**

1.   Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement.  The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied. On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013.  The special assessment is due on the date of sentencing.

Defendant's Initials _MJA_                    9

2.    <u>Supervised Release</u>

The defendant understands that the offenses to which the defendant is pleading provide for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.    <u>Immigration Consequences of Pleading Guilty</u>

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4.    <u>Sentencing Information</u>

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the counts to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies.  The United States further reserves its right to

make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5. <u>Financial Disclosures</u>

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that her financial statement and disclosures will be complete, accurate and truthful and will include all assets in which she has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to

the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.    Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make

with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

    7.   <u>Defendant's Waiver of Right to Appeal the Sentence</u>

        The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

    8.   <u>Middle District of Florida Agreement</u>

        It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this

office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9.     <u>Filing of Agreement</u>

This agreement shall be presented to the Court, in open court or <u>in camera</u>, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.     <u>Voluntariness</u>

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind.  The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any).  The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront

Defendant's Initials _MSPr_             14

and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.   Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

Defendant's Initials _MJH_                15

12.   Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13.   Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this _23th_ day of January, 2019.

MICHAEL ANDREWS
Defendant


Fritz Scheller
Attorney for Defendant


MARIA CHAPA LOPEZ
United States Attorney


Sean P. Shecter
Assistant United States Attorney


Roger Handberg
Assistant United States Attorney
Chief, Orlando Division


Defendant's Initials _MJA_            16

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 6:18-cr-182-Orl-37KRS
                                              6:18-cr-183-Orl-37DCI
MICHAEL ANDREWS
a/k/a "Clutch"

## PERSONALIZATION OF ELEMENTS

1.      Did you and someone else in some way agree to try to
        accomplish a shared and unlawful plan to distribute, or to
        possess with intent to distribute, methamphetamine?

2.      Did you know of the unlawful purpose of the plan and did
        you willfully join in it?

3.      Was the object of the unlawful plan to distribute, or to
        possess with the intent to distribute, 50 grams or more of
        methamphetamine?

Defendant's Initials _MA_                17

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO. 6:18-cr-182-Orl-37KRS
                                                          6:18-cr-183-Orl-37DCI

MICHAEL ANDREWS
    a/k/a "Clutch"

FACTUAL BASIS

Beginning on an unknown date, but not later than on or about April 1,

2017, and continuing through on or about November 6, 2017, in the Middle

District of Florida, and elsewhere, the defendant, Michael ANDREWS, a/k/a

"Clutch," knowingly, willfully and intentionally conspired with Cindy

BLEDSOE and Jason STRINGER, and others, both known and unknown, to

possess with intent to distribute a controlled substance, which violation

involved 50 grams or more of methamphetamine, a Schedule II controlled

substance and is therefore punished under 21 U.S.C. § 841(b)(1)(A).

Beginning on an unknown date, but not later than on or about March

14, 2018, and continuing through on or about March 22, 2018, in the Middle

District of Florida, and elsewhere, the defendant, Michael ANDREWS, a/k/a

"Clutch," knowingly, willfully and intentionally conspired with Keith

Defendant's Initials _M JA_            18

KIRCHOFF and Andrew SHETTLER, a/k/a "Yeti," and others, both

known and unknown, to possess with intent to distribute a controlled

substance, which violation involved 50 grams or more of methamphetamine, a

Schedule II controlled substance and is therefore punished under 21 U.S.C.

§ 841(b)(1)(A).

The facts giving rise to the offenses are summarized below:

**General Investigation Background**

In April 2017, the FBI, and later the DEA, started an investigation into

the drug trafficking organizations (DTO) that supplied outlaw motorcycle

clubs, including the Pagans Motorcycle Club (Pagans), operating in the

Middle District of Florida with distribution amounts of methamphetamine.

Specifically, the investigation into the Pagans began after a rival outlaw

motorcycle gang member, Christopher Keating, was killed by the members of

the Pagans on April 3, 2017 at a bar located in Daytona Beach, Florida

(Daytona Bar).  As a result of the homicide of Keating, local and federal

officials started to investigate members of the Pagans that operated in the

Daytona Beach, Florida, area, including ANDREWS, who was the sergeant

at arms or enforcer for the local Pagans' chapter located in Daytona Beach.

Defendant's Initials _____    19

**The Pagans, Affiliated Groups and the Distribution of Methamphetamine**

The Pagans is a criminal organization that operates as a motorcycle club in the states of Florida, Maryland, Delaware, Pennsylvania, West Virginia, New York, New Jersey, and other states. Pagans and its associates engage in numerous types of violent crimes to obtain and maintain control over other motorcycle gangs and clubs in various parts of the United States of America. The Pagans, like other motorcycle clubs, are extremely territorial and protect their territory from rival motorcycle gangs through the use of violence and intimidation.

The Pagans are organized into several regions, with each region being further divided into multiple chapters with five to thirty members in each chapter. A "Mother Club" chapter of veteran Pagans members serves as the national governing body of the Pagans. The Mother Club chapter consists of 13 members including the national president, the national vice president, a national sergeant at arms, a national treasurer, and nine other members. The Mother Club chapter is responsible for setting overall policy for the Pagans, scheduling events such as "runs," and enforcing the rules and regulations of the Pagans.

Local chapters of the Pagans consist of a president, vice president, sergeant at arms, treasurer, and other regular or general members. These local

chapters hold meetings referred to as "church" on a weekly basis, bike night festivities open to the public weekly, as well as regional and national mandatory events.  In the state of Florida, the Pagans have three known chapters, which are located in the Keys, Pasco County, Florida, and Volusia County, Florida (referred to as East Coast).  ANDREWS was the sergeant at arms and member of the East Coast Chapter.

Pagans' full members wear "colors" or "cuts," which is a sleeveless denim jacket with patches affixed in specific places.  The patches include, but are not limited to, a patch containing the word "Pagans" and a "1%" patch.  Members of the Mother Club wear a "13" patch on their cut.  "Prospects" for full membership also wear a cut, but will be missing several of the patches worn by full members.  Regional and national events are required of members, and failure to appear at these events as mandated may result in a member being stripped of their full patch status, fined, and/or assaulted by other Pagans.

The Pagans also engage in drug trafficking in order to facilitate and maintain the group's goals. Pagans use local bars in what they consider their territory for a two-fold purpose.  First, use of local bars assists in the control of territory.  Maintaining control of these bars allows these clubs to recruit new members, which in turn brings in more funds and support from the local

patrons of the bar.  Second, the Pagans use local bars to earn "income" for the

motorcycle club through the sale of controlled substances.  Pagans' members

establish control of the narcotics dealing in local bars, ensuring through

intimidation and threats that they are the only group selling drugs in those

establishments.

Pagans use the proceeds from the sale of drugs in local bars in order to

further the Pagans as a whole, as income derived from these sales is used to

pay for the upkeep of individual member motorcycles and pay weekly club

dues, both of which are required to maintain their status within the club.

Additionally, income derived is also used to fund members' attendance at

local parties and events, including travel to national Pagans motorcycle runs

out of state.

During the past several years, the Daytona Bar became a Pagans

dominated and controlled establishment.  The Daytona Bar was utilized by

the Pagans, including ANDREWS and Brian BURT, a/k/a "Sledge," and

former bartenders at the Daytona Bar, including BLEDSOE, to distribute

various amounts of methamphetamine to the Pagans and their affiliated

groups.  BURT is a member of the Pagans' Mother Club and is the regional

"boss" for Florida Chapters.  ~~[struck through]~~, ANDREWS would receive ~~[struck through]~~

~~[struck through]~~ methamphetamine ~~[struck through]~~ from BLEDSOE, sometimes in SPS/FS/MDA

ounces amounts.

Defendant's Initials _MJH_          22

One of the groups affiliated with the Pagans is the Thunderguards
Motorcycle Club ("Thunderguards") for which SHETTLER is a member.
The Thunderguards is a criminal organization that is a support club to the
Pagans, which operates as a motorcycle club in the states of Florida,
Maryland, Delaware, and South Carolina.

Between January 2018 and July 2018, the FBI and DEA conducted
controlled purchases of methamphetamine with an undercover officer
("UCO") and several confidential informants ("CI") and intercepted
conversations over nine telephones utilized by the various DTOs and their
members.

Specifically, law enforcement intercepted wire and electronic
communications on telephone numbers utilized by ANDREWS ("Target
Telephone-1"), BURT ("Target Telephone-2") and SHETTLER ("Target
Telephone-8") and obtained information from BLEDSOE's phone through
the issuance of several search warrants.  As a result, law enforcement learned
that between on or about April 1, 2017 until on or about March 22, 2018,
ANDREWS was responsible for distributing at least 500 grams of
methamphetamine into the Middle District of Florida.

**April 2017 Communications between BLEDSOE and ANDREWS**

On April 27, 2018 and April 28, 2018, ANDREWS, using Target Telephone-1, exchanged several text messages with BLEDSOE at telephone number (386) 215-3078 about obtaining methamphetamine. Specifically, ANDREWS, on behalf of BURT, who ANDREWS referred to as "*Mom,*" asked how much BLEDSOE would charge for 3.5 grams of methamphetamine. In response, BLEDSOE indicated that she would charge ANDREWS and BURT $175. In addition, BLEDSOE asked about money that was owed to her, BLEDSOE, by BURT from a previous sale of methamphetamine to BURT ("*What happened to last nights money from* [BURT]*?*"). In response ANDREWS texted the following: *I got money for you from* [BURT] *but I may have another deal for yah.* Specifically, ANDREWS stated that he needed additional amounts of methamphetamine for the Pagans East Coast Chapter ("*I have orders to do for club*").

**May 2017—Conversations between, BLEDSOE, ANDREWS and BURT**

On May 11, 2017 and May 12, 2017, ANDREWS, using Target Telephone-1, exchanged text messages with BLEDSOE, at telephone number (386) 215-3078. During these text messages, BLEDSOE indicated that she was heading up to Georgia ("*Up north*") to obtain a resupply of methamphetamine from her main source of supply. Specifically, BLEDSOE

Defendant's Initials _AJH_                24

was seeking to obtain one half kilogram of methamphetamine for $6500.  In

one text message, BLEDSOE indicated that ANDREWS could *"make some*

*money if you can take that trip with me."*  In another text message, BLEDSOE

made clear that she was asking ANDREWS if *"*[he] *want to drive me there and*

*back bc you'll get paid."*  In response ANDREWS indicated that he would need

to talk with BURT first because ANDREWS had club business on that

Sunday (*I wish I fucking could but I have sledge to worry about).*  ANDREWS also

stated *"If he said yes I would but you know I can't do that this weekends mother day I*

*have to be here Sunday so I don't think I can babe."*  BLEDSOE told ANDREWS

to ask BURT and even subsequently texted BURT at Target Telephone-2 the

following: *"Hey can your protégé do me a favor driving me somewhere?  It'll take all*

*night but we'll be back tomorrow afternoon."*

On May 13, 2017, at approximately 12:10 a.m., BURT, using Target

Telephone-2, texted both BLEDSOE, at telephone number (386) 215-3078,

and ANDREWS, at Target Telephone-1, to request an update on their trip to

Georgia to obtain methamphetamine.  Specifically, BURT texted *"Did you*

*guyz leave yet what ya waiting on."*  Then a little after 2:00 a.m., ANDREWS

informed BLEDSOE that he could be picked up at BURT's house.  A ~~couple~~

~~few~~ of hours later, BLEDSOE and ANDREWS, obtained approximately one half

kilogram of methamphetamine from BLEDSOE's source of supply in

Defendant's Initials _____           25

Georgia.  Both BLEDSOE and ANDREWS then transported the

methamphetamine back to Daytona Beach, Florida.  Some of that

methamphetamine was then distributed to members of the Pagans.

## AUGUST 2017—Communications between ANDREWS and BLEDSOE about BURT Buying Meth

On August 16, 2017, ANDREWS, using Target Telephone-1, texted

BLEDSOE at telephone number (386) 215-3078 to arrange for the purchase of

approximately one ounce of methamphetamine for BURT and the Pagans

(*"Mom* [BURT] *wants me to grab 1"*).

## October-November 2017—Conversations between ANDREWS and BLEDSOE about Purchasing Methamphetamine and Arrest of Bledsoe

On October 21 and October 22, 2017, ANDREWS, using Target

Telephone-1, exchanged text messages with BLEDSOE at telephone number

(386) 215-3078.  ANDREWS informed BLEDSOE that he and other members

of the PAGANS, including BURT, were out of methamphetamine and

wanted to meet with BLEDSOE to obtain more methamphetamine (*"Cindy I

need to meet I'm out,"* *"we're all out,"* and *"I have bike week going on and brothers

everywhere that I'm running around for"*).  After ANDREWS and BLEDSOE

could not agree on a time to meet, ANDREWS told BLEDSOE he would text

BLEDSOE to arrange a meeting once he got back to the Pagans' clubhouse

(*"Wen I get back to clubhouse I will text you ASAP"*).  Ultimately, ANDREWS

Defendant's Initials _MJB_                26

did not get back to BLEDSOE, and so several hours later BLEDSOE texted

ANDREWS the following: *"I saved shit for you that I could have sold easily."*

In November 2017, BLEDSOE traveled to Georgia to pick up a

kilogram of methamphetamine from her source of supply in exchange for

$14,000.  On November 6, 2017, at approximately 11:50 p.m., a Lowndes

County (Georgia) corporal lawfully stopped a vehicle driven by BLEDSOE

travelling south bound on interstate 75 in Lowndes County, Georgia.  Inside

the vehicle, deputies found 1 kilogram of methamphetamine with a purity

level of 100%.

### March 14, 2018 KIRCHOFF Agrees to Provide ANDREWS with Methamphetamine for $400 an Ounce

Between March 14, 2018, at approximately 5:48 p.m. and March 15,

2018 at approximately 6:25 a.m., there were a series of text messages between

KIRCHOFF, using telephone number (850) 541-4564, and ANDREWS,

using Target Telephone-1.  During this exchange of text messages,

KIRCHOFF told ANDREWS that KIRCHOFF would give ANDREWS

one ounce of methamphetamine for $400 (*"400 each"*) even though

KIRCHOFF charged other individuals as much as $700 per ounce (*"I charge

others 700"*).  KIRCHOFF told ANDREWS that KIRCHOFF needed to

know how many ounces ANDREWS wanted before Friday so KIRCHOFF

could order the methamphetamine from KIRCHOFF's supplier (*"let me know by Friday so I can place order"*).

### March 17-18 2018—Additional Conversations between KIRCHOFF and ANDREWS about the Purchase of Methamphetamine

On March 17, 2018, at approximately 11:21 p.m., ANDREWS, using Target Telephone-1, placed an outgoing call to KIRCHOFF at telephone number (850) 541-4564.  While traveling up from Key West to meet with his source of supply, KIRCHOFF informed ANDREWS that KIRCHOFF's supplier raised the price to $450 an ounce(*"four five a piece"*).  In response, ANDREWS informed KIRCHOFF that ANDREWS already informed his customers that the price was $400 an ounce based on their previous discussion a few days before (*"I've already told everybody fuckin that number"*).  KIRCHOFF told ANDREWS that if ANDREWS could provide KIRCHOFF with $900 (*"900"*), KIRCHOFF would be able to get one pound of methamphetamine (*"16 whole ones"*).  KIRCHOFF also told ANDREWS that he, ANDREWS, would receive two ounces of methamphetamine for his $900 (*"two of them for 9"*).  In response, ANDREWS requested that KIRCHOFF get him three ounces of methamphetamine (*Ah geez. Throw in three and I'll make it, I'll try to make this happen*).  Below is a full transcript of the call:

MA:  *Hey man check it out, I'm definitely going to need you to come back. I know you prolly left though right? Couldn't get to my phone with so much shit going on during bike week right now.*

Defendant's Initials _MJH_              28

KK:   *Yea I'm just now leaving Key West.*

MA:   *Oh ok. Alright alright that's cool. I got some time then. Good good good . I thought you were already on your way up.*

KK:   *I wanted to be but you know how the fuckin day goes.*

MA:   *Yea you know what, ill see you when you get through. Keep me informed. Let me know ima try to get it all gathered up later. There's a lot going on you gotta bear with me though, you know what I mean? I'm sorry there's a lot going on for bike week. It's a tough time.*

KK:   *I know. Text me an address to where I'm going please.*

MA:   *Um it's not gonna be anywhere near the clubhouse. Probably be like my house if you're comin through. I don't know what time you're planning on it or what.*

KK:   *Well I'm leavin I'm leavin Key West right now so its I'm 6 hours away, 6.5, 6-7 hours so.*

MA:   *Yea yea. You gonna rest a little bit? Or you gonna just hang out and just take off from*

KK:   *Uh. Probably just fuckin, we might hang out for like an hour or something but I need I want to get up the rest of the way up there*

MA:   *Ah no no. Whatever the hell you want to do. I don't give a fuck I'm not tryin to keep ya.*

KK:   *Hahaha*

MA:   *Do what you wanna do but im tryin to um need a time to get that all...I've had no fuckin time to call these people up so its like now im within that time with you travelin so*

KK:   *Right*

MA:   *I'm gonna get on top of this alright*

KK:   *I gotta I gotta. They raised it up to, they're 45 a piece. So whatever you need you just let me know*

MA:   *Alright*

KK:   *Ok?*

MA:   *Let me see what I can do cuz I've already told everybody fuckin that number so*

KK:   *Yea they changed it on me. Called me at 5 o clock this morning.*

MA:   *Its all club shit. Its all club people so I mean that's it. I don't deal with*

KK:   *Put it this way. If you can raise 900 bucks for me, ill have enough money to get a elbow.*

MA:   *Yea what?*

KK:   *If you can come up with 900 I can get an elbow. When I go up there. The whole fuckin thing.*

MA:   *What's that?*

KK:   *16 of um. 16 whole ones.*

MA:   *16 o's?*

KK:   *Yea. Yea.*
MA:   *So what the hell do I get what do I get out of that*
KK:   *Uhhh you get like 450 be two of em. For 9.*
MA:   *Ah geez. Throw in three and I'll make it, I'll try to make this happen.*
KK:   *We'll sit down and talk when I get there. We'll see where it's at.*
MA:   *Yea yea yea we'll sit down and talk. We'll sit down and talk. Alright sounds good.*
KK:   *Alright brother.*
MA:   *Alright brother. I'll see you when you get here let me know and ill (unintelligible)...let me know when you're close.*
KK:   *Like I said just text me an address so I can put it in the GPS so I ain't gotta worry about it.*
MA:   *You got it brother.*
KK:   *Thank you.*
MA:   *I'll do it right now. You got it bye.*
KK:   *Bye.*

On March 18, 2018, at approximately 9:00 a.m., KIRCHOFF drove to ANDREWS' residence located in Palm Cost, Florida, to discuss the amount of methamphetamine that KIRCHOFF could provide ANDREWS.

## March 19-20, 2018, ANDREWS and SHETTLER Discuss Obtaining Methamphetamine from KIRCHOFF

Between March 19, 2018 at approximately 9:38 p.m., and March 19, 2018, at approximately 10:08 p.m., there were a series of text messages between KIRCHOFF, using telephone number (850) 541-4564, and ANDREWS, using Target Telephone-1.  ANDREWS indicated that he wanted to talk with KIRCHOFF about the amount of methamphetamine KIRCHOFF had for ANDREWS (*Hey bro you around been trying to call you*

Defendant's Initials ___MJA___          30

*about head count).*  In response, KIRCHOFF told ANDREWS to call

KIRCHOFF back.

A minute later, on March 19, 2018, at approximately 10:09 p.m.,

ANDREWS, using Target Telephone-1, placed an outgoing call to

KIRCHOFF at telephone number (850) 541-4564.  During the call,

KIRCHOFF told ANDREWS that he just picked up ten ounces of

methamphetamine (*"I picked up 10 last night"*).  KIRCHOFF described the

methamphetamine as *"fucking beautiful dude. Fucking beautiful. Yellow tint all big*

*pieces."*  In addition to the two ounces ANDREWS ordered from KIRCHOFF,

ANDREWS then asked if KIRCHOFF could provide an additional ounce to

ANDREWS (*Oh ok alright yeah, you don't have room for another one? Because I got*

*two).*  KIRCHOFF responded that he would have to call his source of supply

because two ounces were for KIRCHOFF (*"two for me"*), one ounce was

possibly for his lady friend (*"one for my old lady"*) and the other ounces were for

other people (*"the rest are kind of spoken for"*).  Below is a partial transcript of the

call:

KK:  . . . *Let me go do the call. I picked up 10 last night.*
MA:  *What?*
KK:  *I picked up 10 last night.*
MA:  *Oh shit.*
KK:  *Yeah dude its fucking beautiful dude. Fucking beautiful. Yellow tint all big*
*pieces.*
MA:  *Ah boy brother (inaudible)*
KK:  (Laughs)

Defendant's Initials  *MJK*          31

MA: *I know (inaudible) I just don't want you to head out of there without fucking taking care of fucking we need so*

KK: *Well alright*

MA: *So I'm trying I mean if that happens I'll don't worry about it I know you probably don't have the funds for it I mean you got my word if you did have the funds for it you got my fucking word*

KK: *I know I have money on me to get one more but uh you know*

MA: *Yeah*

KK: *I might be able to finagle two because my old lady's got a little bit of money* (laughs)

MA: *I mean you do got one from me already right?*

KK: *Yes yes*

MA: *Alright for somebody else*

(talking over each other)

MA: *Alight alright so when you get back long story short you're getting back later you'll have money and go back for more too that's awesome if you could do that but uh I'm trying to get you that fucking big amount to go you know*

(talking over each other)

KK: *Like I said I'll bring that one for you for sure and I'll see what I can do about more.*

MA: *What?*

KK: *I got to bring that one bag to you for sure*

MA: *Oh ok alright yeah, you don't have room for another one? Because I got two*

(MA and UM4564 talking over each other)

KK: *I got to pick up another one I gotta call her. I have the one for you for sure.*

MA: *Alright. You have to call someone else to make sure it's alright what?*

KK: *I said I got the one for sure for you I gotta call and get another one*

MA: *Oh ok. The other ones are already taken for?*

KK: *Yeah all the rest are kind of spoken for.*

MA: *Ah fuck alright.*

KK: *I got two for me and one for my old lady.*

MA: *You already did those you're not going back?*

KK: *Yeah I will, I'm gonna call in a minute.*

MA: *Alright alright. When do I have to get this to you? Like before tomorrow?*

(talking over each other)

KK:   *I got enough to cover it when I get there and you can get it to me when I see you*

Nearly an hour later, at approximately 11:02 p.m., ANDREWS using

Target Telephone-1, placed an outgoing call to SHETTLER at Target

Telephone-8.  During this call ANDREWS informed SHETTLER about the

methamphetamine deal with KIRCHOFF.  Below is a transcript of a part of

the call:

MA:   *Alright I tried fucking Christ what fucking luck this is my fucking luck every time. (Laughs) Hey, just to let you know, fyi,  that guy is probably doing one or two he's doing for us right now as of now, but I gotta give him a call on the others, and he will stop again but we only have until fucking 2 o'clock tomorrow.*
AS:   *So in other words don't just us two right now.*
MA:   *Yeah*
AS:   *Alright*
MA:   *The only I mean I'm not getting any answers from anybody so.*
AS:   *Alright so. That's what (unintelligible)*
MA:   *If he buys just for two then yeah we can do but uh tell him that uh if you're good for two then they're all gonna be at fucking six so we can get the extra out of it for us, but I've got to get that money you've got to get that money from him so I can send it to him is the only way it's gonna work.*
MA:   *I mean he might be able have enough to do it himself but I gotta have that money for him like in hand he's not fucking around with that he's like if you don't have it so he's going to have to do without that money for like a day or two. He's coming in Wednesday night evening probably late.*

AS:   *Alright, I'll let him know.*

(Unintelligible female in the background)

MA:   *Alright*
AS:   *Alright*
MA:   *So that's all I mean that's all you get right now that nobody else answered back yet, so we just have until tomorrow to 2 o'clock at the latest he's leaving that area*

> *to go back and see his kid and then he's going home from there so whatever he's*
> *got he's got at that point, so.*

AS: *Alright I'll let him know.*
MA: *Alright brother*
AS: *Alright*
MA: *Later*
AS: *Later*

The next day, on March 20, 2018 at approximately 6:16 p.m.,

ANDREWS, using Target Telephone-1, called SHETTLER, at Target

Telephone-8. During this call, SHETTLER requested two ounces of

methamphetamine from the methamphetamine ANDREWS would obtain

from KIRCHOFF. After SHETTLER repeatedly requested two ounces,

ANDREWS responded *I really don't wanna talk on the phone with this. Yeah, I*

*mean, well, I need to know that.* Below is transcript of a part of the call a

summary of the call:

AS: *Hey*
MA: *What up bro?*
AS: *Hey uhh, I was seeing if you'd get in town here or not*
MA: *Yea uhh, no, not, probably not til Wednesday brother, either Wednesday night.*
    *He seen his kids and realized stay here then he's gonna go. He's already got a lot*
    *I think he's passed through at 1 or 2 o'clock today so it's just me and you.  I*
    *guess right now till, unless he decides to get rid of a [UI].*
AS: *Well is there a way I could get two*
MA: *Yaa, I'll talk to him.*
AS: *I'll take*
MA: *I mean I'll see what he says right now*
AS: *I'll get two*
MA: *Do what*
AS: *I said, I, I'll get two*
MA: *Alright*

AS:   *Well if it's just me and you, I'll just, I'll take two.*
MA:   *Alright, well, we don't have Larry involved or? I had all these other people that you said were comin.*
AS:   *Mmmm*
MA:   *And, no?*
AS:   *I thought you said we can only get for ourselves?*
MA:   *Don't, help, but I'm trying to figure out why we're scrumming money we got else, with everybody else. So, I, I really don't wanna talk on the phone*
AS:   *Oh so*
MA:   *I really don't wanna talk on the phone with this. Yeah, I mean, well, I need to know that.*
AS:   *Oh got ya, I got ya*
MA:   *I need to. At least I can converate with him and figure that out.*
AS:   *So you're just*
MA:   *You know what I mean, but if he says no then he says no, but ya know. Im trying to fuckin get to, I had to 1 o'clock, but I can massage it and see where he's doing. He might be uh, getting up late today and shit like that, so it might be working out. So I mean, I didn't know, who you got that could? Anybody or no?*
AS:   *Well, that other guy, he said he just wants one.*
MA:   *You talk to the other guy?*
AS:   *Yea*
MA:   *What you put it at?*
AS:   *Well, I told him six at one*
MA:   *Alright. Oh, alright*
AS:   *So six, that's why I'm telling you I'll take two, cuz he'll take one and I'll take one.*
MA:   *He'll take what? Oh oh, yea, yea, alright, umm, five, six, umm, alright, say you come up with another fuckin 3, 4. Alright so we should be alright with a fuckin sixteen of this and*
AS:   *Right, did you get uh*
MA:   *Just the three of us*
AS:   *Did you?*
MA:   *If Larry comes in we can take another hundred out of it. Umm*

Less than forty minutes later, ANDREWS, using Target Telephone-1,

called KIRCHOFF at telephone number (386) 541-4564, used by

KIRCHOFF.  During this call ANDREWS asked if KIRCHOFF could obtain

Defendant's Initials           35

additional amounts of methamphetamine.   Below is a transcript of a part of

the call:

KK: *Hello*
MA: *What up Bro?*
KK: *Hello. Hey what's up ?*
MA: *Hey, what's going on*
KK: *Nothing much uumm on the way to Panama City, so I got court in the morning*
MA: *Nice nice nice alright uuumm uh so I what came across with right now is three.*
   *I know its late but (talking at the same time) [inaudible]*
KK: *[inaudible] let me so who I still got in Panama if I could pick anymore up.*
MA: *Huuhh ?*
KK: *Let me check where in Panama, see if I can grab anymore. I got I got one for*
   *you.*
MA: *Uuuh you only have one now. Ok ok I had another one for another guy too*
KK: *I'm trying I couldn't get anymore more last night*
MA: *Aaahh shit*
KK: *Up there*
MA: *Alright*
KK: *Let me see let me see what I can do in Panama*
MA: *Uuuh*
KK: *Let me see what if can buy any in Panama City*
MA: *Is it cheaper or no*
KK: *Aaah uuh about the same. Alright it might be 500.*
MA: *Aah if it was cheaper then let me know that because I'm trying to make a couple*
   *of bucks. To pay for my [laughing] something like that , because I'm like fucking*
   *broke. Something like that you know what I mean.*
KK: *[inaudible] let me get off the phone, I will call you back*
MA: *Hook it up hook it up brother . . . I got another guy and this one guy coming and*
   *his so there's a total of 3. Right now so I mean if you can make do all that then*
   *that will be beautiful. You there …Hello Hello I lost you.*

### March 21-22, 2018—KIRCHOFF Arrested During Traffic Stop and Follow-Up Conversations Between ANDREWS and SHETTLER

On March 21, 2018, at approximately 7:30 p.m., outside the Middle

District of Florida, the Florida Highway Patrol conducted a lawful traffic stop

Defendant's Initials _MJA_   36

of a vehicle driven by KIRCHOFF.  Inside the vehicle law enforcement found

ten ounces of methamphetamine at 100 percent purity and a firearm.  As a

result, law enforcement arrested KIRCHOFF.

Over two hours later, at approximately 9:54 p.m., ANDREWS, using

Target Telephone-1, texted KIRCHOFF at telephone number (850) 541-4564

*"Hey where you at"*

A few hours later, on March 22, 2018, at approximately 12:25 a.m.

SHETTLER, using Target Telephone-8, called ANDREWS at Target

Telephone-1.  During the call, ANDREWS informed SHETTLER that he,

ANDREWS, was still waiting for KIRCHOFF to deliver the

methamphetamine.  In response, SHETTLER and ANDREWS then stated

the following:

AS:   *Well I got people that are already paid for stuff so…*
MA:   *Say what?*
AS:   *I've already got people that paid for stuff so they want it tonight.  So if you as soon as I get it I can get it to them.*
MA:   *Oh you're gonna come back to grab the money then?*
AS:   *No.  I'm saying that people have already paid me for stuff, so I'm gonna break it down, give it to them, on the way back here.*
MA:   *Alright.  Yeah well it's not here.  Did you hear what I'm saying like he's not, I don't know where he is right now *laughs**
AS:   *I know but…*
MA:   *He could be fucking four hours away still.  I don't know what time…*
AS:   *I know.  I know that.*

(later in the call)

MA:   *So whatever you wanna do brother it's on you.  But... as soon as I get a fucking direct call I'm calling you ASAP so...he'll call me an hour before he gets here I know that.*

On March 22, 2018, at approximately 11:17 a.m., ANDREWS, using

Target Telephone-1, called SHETTLER at Target Telephone-8.  During this

call ANDREWS informed SHETTLER that KIRCHOFF was arrested.

SHETTLER and ANDREWS then discussed possibly getting

methamphetamine from a different source of supply ("*another route*").

Specifically they stated the following:

MA:   *As soon as I get my fucking bike shit done. I mean..I...I...I got no problem, you know,  holding it. So...It sucks. Really sucks bad, sucks really bad right now *laughs* I don't know what else to do now either...I mean we gotta go uh...we got to uuh another route so with what she  is she possible to fucking do anything or what? Or you think it's even worth going that way?*

AS:   *I can't understand what the hell you're trying to say.*

MA:   *Another route. Like to get something cuz we're losing out*

AS:   *Another route? Well I mean yeah but...we can always find another route but...for that price...*

MA:   *Yeah I know.  I know that's good stuff and...*

AS:   *Are you gonna be in town any time of day or do I need to come out there to grab that?*

MA:   *That's what I just told you.  I'm not going anywhere til I get my fucking bike done.  This is what I'm saying, I have a motor apart right now.  I'm piecing it together.*

AS:   *Alright so I'll come out that way.*

MA:   *I could be there like late afternoon, like you know evening, you know I could be done with it I'm assembling it right now so it'd be that or you can come and get it anytime between then.*

AS:   *Alright man.*

MA:   *I'm sorry, I apologize about it.*

Defendant's Initials _MA_     38

## Pleas and Plea-Related Documents
6:18-cr-00182-RBD-KRS USA v. Bledsoe et al

CUSTODY, TRLSET

### U.S. District Court

### Middle District of Florida

## Notice of Electronic Filing

The following transaction was entered by Shecter, Sean on 1/29/2019 at 1:31 PM EST and filed on 1/29/2019

**Case Name:** USA v. Bledsoe et al
**Case Number:** 6:18-cr-00182-RBD-KRS
**Filer:**
**Document Number:** 60

**Docket Text:**
**PLEA AGREEMENT re: count(s) One of the Indictment as to Michael Andrews (Shecter, Sean)**

**6:18-cr-00182-RBD-KRS-2 Notice has been electronically mailed to:**

Fritz J. Scheller    fscheller@flusalaw.com, yvolyk@flusalaw.com

Sean Phillip Shecter    sean.shecter@usdoj.gov, caseview.ecf@usdoj.gov, orldocket.mailbox@usdoj.gov, usaflm.orl_ecf@usdoj.gov

Thomas Devlin Sommerville    tom@sommervillelaw.com, fran@sommervillelaw.com

**6:18-cr-00182-RBD-KRS-2 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1069447731 [Date=1/29/2019] [FileNumber=18023683-0] [9345a53a195a09f6ef17d5ab108d68135667ad47017ebfdb1bcebe6ffdbc063436 396d10222e52085c17ea48d11c0e7a158df859b299779fb1c74f6ccf20be8d]]

**Pleas and Plea-Related Documents**
6:18-cr-00183-RBD-DCI USA v. Kirchoff et al

CUSTODY, TRLSET

### U.S. District Court

### Middle District of Florida

## Notice of Electronic Filing

The following transaction was entered by Shecter, Sean on 1/29/2019 at 1:32 PM EST and filed on 1/29/2019
**Case Name:**        USA v. Kirchoff et al
**Case Number:**      6:18-cr-00183-RBD-DCI
**Filer:**
**Document Number:** 88

**Docket Text:**
**PLEA AGREEMENT re: count(s) One of the Indictment as to Michael Andrews (Shecter, Sean)**

**6:18-cr-00183-RBD-DCI-2 Notice has been electronically mailed to:**

David Anthony Wilson     david@dwilsonlaw.com, wilsonlawfirm@gmail.com

Fritz J. Scheller     fscheller@flusalaw.com, yvolyk@flusalaw.com

Sean Phillip Shecter     sean.shecter@usdoj.gov, caseview.ecf@usdoj.gov, orldocket.mailbox@usdoj.gov, usaflm.orl_ecf@usdoj.gov

Thomas H. Dale     dalelaworlando@outlook.com

**6:18-cr-00183-RBD-DCI-2 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1069447731 [Date=1/29/2019] [FileNumber=18023689-0] [58b1a0a2943a36c809fa388aa063782ccfd4f3269e1a75f7e2ff5a1ad7ecd53188 4b662108b198b3b0f5af8e5dbc096744646b0189f0cb2da0db3cc547383d99]]